IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **DAVONE DESEAN WALKER**, | **Case No. 5:24-cr-51-JDW** |

### MEMORANDUM

There's no place like home. "The home occupies a sacrosanct place in our Fourth Amendment jurisprudence." *United States v. Harrison*, 689 F.3d 301, 307 (3d Cir. 2012) (quotation omitted). In fact, "[f]reedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996) (same). Thus, in the usual course, judicial officers—not police officers—decide when the "the right of privacy must reasonably yield to the right of search." *United States v. Ritter*, 416 F.3d 256, 264 (3d Cir. 2005) (same).

In this case, Pennsylvania State Troopers entered and secured Davone Desean Walker's apartment before seeking a warrant—"a tactic sometimes used to respond to emergency circumstances." *United States v. Alexander*, 54 F.4th 162, 165 (3d Cir. 2022). But the Government concedes that there were no exigent circumstances at the time officers conducted the so-called "hit-and-hold." So, while the Third Circuit has suggested that hit-and-holds might pass constitutional muster in some instances, this case is not one of them. Indeed, the facts of this case are troubling, and the Pennsylvania State

Troopers did not rely in good faith on a judicial order when they disregarded the Fourth Amendment's warrant requirement. Nevertheless, I will deny Mr. Walker's motion to suppress because he has not demonstrated that the officers' conduct was more than an isolated act of negligence.

I.      RELEVANT BACKGROUND

   A.      Factual History

On June 20, 2023, the Pennsylvania State Police received notice of a suspicious package at a shipping facility in Northampton County, Pennsylvania. Troopers Cody Montz and Peter Burghart arrived at the shipping facility to investigate. Trooper Burghart's canine partner, Evan, alerted to the presence of narcotics in the package. After another trooper obtained a search warrant for the package, the troopers discovered a camouflage-print container with a bright orange zipper that contained three one-gallon bags filled with approximately two pounds of methamphetamine each (for a total of six pounds of meth). The package had shipped from Miguel Garcia in Huntington Park, California and was addressed to John Krick, Apt. 2, 3637 Dorney Park Road, Allentown, Pennsylvania 18104. The officers decided to pursue a controlled delivery operation to further their investigation.

Based on his training and experience, Trooper Montz had reason to believe that the person who sent the package had used a fictitious name for the recipient and that the package might be moved somewhere other than the intended address. In fact, Trooper Montz could not identify anyone named "John Krick" who lived at the intended delivery

2

address. As part of his investigation, Trooper Montz sought authority to place a mobile tracking device in the package. The device's GPS function would permit authorities to maintain electronic surveillance of the package from one location to another. There was also a light sensor on the device that would set-off an alert once someone opened the package.

To apply for permission to track the package with a GPS monitor, Assistant District Attorney Craig Sheetz from the Lehigh County District Attorney's Office applied for a court order from the Honorable Anna-Kristie Marks of the Lehigh County Court of Common Pleas. ADA Sheetz submitted an Application For Order Authorizing The Installation And Use Of A Mobile Tracking Device (the "Tracker Application"). As part of the application process, Trooper Montz submitted an Affidavit In Support For Order Authorizing The Installation And Use Of A Mobile Tracking Device (the "Tracker Affidavit"). The Tracker Application stated:

> Trooper Cody Montz of the Pennsylvania State Police has prepared an Affidavit which is attached to this Application, incorporated herein by reference and labeled as "Exhibit A", setting forth specific and articulable facts establishing probable cause to believe that criminal activity has been, is or will be in progress and that the use of a mobile tracking device will yield information relevant to the investigation of criminal activity.

(ECF No. 30 at p. 27, ¶ 4.) In his affidavit, Trooper Montz explained that law enforcement officers would execute a search warrant for the specific address on the package when they received notification that someone opened it, "so long as the parcel is located within that residence at the time of notification." (*Id.* at p. 35, ¶ 12.) He also wrote: "In the event that the package is taken into a secondary location, your affiant requests authorization for officers to enter that secondary location and secure the package and apply for additional

search warrants(s)." (ECF No. 30 at p. 35, ¶ 12.) This is known as a "hit-and-hold," and Trooper Montz discussed the hit-and-hold with ADA Sheetz during the application process. However, ADA Sheetz's Tracker Application did not include an express request to conduct a hit-and-hold of a secondary location.

That same day, Judge Marks issued an Order For Authorizing The Installation And Use Of A Mobile Tracking Device (the "Tracker Order"),[1] granting the Tracker Application to use a tracking device to monitor the package after the controlled delivery. The first paragraph of the Tracker Order states that the Tracker Application was "attached and incorporated for all purposes." (*Id.* at p. 23.) The body of the Tracker Order authorized law enforcement to put a tracking device in the package and continue monitoring it "even if the tracking device is moved within any area protected by a reasonable expectation of privacy[,]" among other things. (*Id.* at p. 25, ¶ 8.) The Tracker Order did not include an express authorization to conduct a hit-and-hold of a secondary location.

At the same time ADA Sheetz applied for the Tracker Order, Trooper Montz applied for an anticipatory search warrant for the address listed on the package: Apt. 2, 3637 Dorney Park Road, Allentown, Pennsylvania 18104. He submitted an Affidavit Of Probable Cause to support the warrant application, and the contents of that affidavit mirror those in the Tracker Affidavit, including his request to conduct a hit-and-hold of a secondary

---

[1] It is not clear from the record whether Judge Marks used a proposed order that ADA Sheetz or Trooper Montz submitted or whether she drafted the Tracker Order herself.

location. However, on the section of the warrant describing the premises to be searched, the warrant lists only the address for Apartment 2, and it does not include an express authorization to conduct a hit-and-hold of a secondary location. Judge Marks approved and issued the search warrant for Apartment 2 (the "Apartment 2 Warrant") around the same time she issued the Tracker Order.

Later that afternoon, an undercover State Trooper delivered the package to the apartment building located at 3637 Dorney Park Road.[2] The building is a Victorian home that has been subdivided into two separate apartments. Apartment 1 is on the ground floor, and Apartment 2 is on the second floor. Mr. Walker lives in Apartment 1.[3] The trooper left the package on the front porch of the building around 3:36 p.m. Around 4:15 p.m., Mr. Walker picked up the package from the front porch and took it into Apartment 1.

After Mr. Walker took the package into his home, nothing happened for many hours. According to Trooper Montz, law enforcement was waiting to see if someone would come pick up the package or whether Mr. Walker would leave with it. Around 9:00 p.m. another individual, Aived Garcia, arrived at Mr. Walker's residence. After a short time, Mr. Garcia left Mr. Walker's apartment without the package. At that point, Trooper Montz decided to "conduct a hit and hold because it was determined that the parcel's probably going to stay

---

[2] The controlled delivery package contained two pounds of meth and four pounds of sham material.
[3] There may be a third apartment in a separate building behind the house, but that apartment is not relevant to this motion.

5

there for the night." (ECF No. 51 at 39:14-16.) He decided to "hold that apartment and then apply for the search warrant after securing [the] equipment and drugs." (*Id.* at 40:15-17.) Trooper Montz did not identify any exigent circumstances that existed at that time, and the Government concedes there were none. (*See* ECF No. 51 at 127:2-6.)

On the night of June 20, 2023, Trooper Montz and other officers conducted the hit-and-hold of Mr. Walker's apartment around 9:30 p.m. They knocked and announced their presence and then entered the apartment through an unlocked door. The officers conducted a protective sweep of the home to determine whether anyone besides Mr. Walker was inside. Another officer, Trooper Stephen DeAngeles, found Mr. Walker in his bedroom and placed him in custody. Trooper DeAngeles searched Mr. Walker for weapons and found a large amount of money in his pocket. He also saw a cell phone sitting on the bed next to Mr. Walker. Once he moved Mr. Walker to the living room, Trooper DeAngeles saw the package that had been delivered, and he also saw a blue drawstring bag next to it. The blue bag was open,[4] and, inside the bag, Trooper DeAngeles could see the orange

---

[4] Mr. Walker implies that officers must have opened the drawstring bag and searched through it to discover the camouflage bag inside, arguing that the camouflage bag was not in plain view. However, I find Trooper DeAngeles's testimony to be credible. And when the Government introduced its Exhibits 12 and 13, I could see the orange zipper in the photos. Trooper DeAngeles also testified that it was easier for him to see it because he had been using a flashlight at the time. Mr. Walker has not offered sufficient evidence to cast doubt on whether that second camouflage case was in plain view when the Troopers conducted the hit-and-hold.

zipper of a different camouflage case that matched the one that they had discovered in the package from California.

Trooper Montz was in Mr. Walker's apartment for about ten minutes before he left to try and obtain a search warrant for Apartment 1. While Trooper Montz applied for the search warrant, other officers remained on the scene and prevented anyone from going in or out of the apartment. They also ensured that no one moved or altered anything in the apartment before Trooper Montz could get a search warrant. Troopers continued to detain Mr. Walker during this time.

Trooper Montz submitted the warrant application at 10:30 p.m. and noted that he had observed the controlled delivery package in Mr. Walker's apartment, as well as another camouflage case that matched the case in that package. Magisterial District Judge Jacob Hammond approved and issued the search warrant at 11:02 p.m. Trooper Montz notified officers at the scene that he had obtained a warrant, and they could begin searching Mr. Walker's residence.

Following the search, officers found a camouflage case containing five one-pound bags of meth and 1,000 Fentanyl pills, a bubble wrapper containing 1 kilogram of Fentanyl, and other narcotics and drug paraphernalia, in addition to the controlled delivery package. Officers arrested Mr. Walker, and Sergeant Joshua Mallery from the Quakertown Borough Police Department interviewed him at 2:11 a.m. on June 21, 2023. Detective Brian Bielecki read Mr. Walker his *Miranda* rights before the interview. Mr. Walker waived his rights and

agreed to speak with the officers without an attorney present. The officers memorialized Mr. Walker's decision on a *Miranda* card, on which Mr. Walker initialed each warning and signed his full name below. Days later, officers also obtained a warrant to search Mr. Walker's cell phone.

### B.    Procedural History

On February 8, 2024, the Government indicted Mr. Walker on one charge of possession with intent to distribute 500 grams or more of methamphetamine and 400 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A). Mr. Walker's trial is scheduled to begin on February 5, 2025, and he has moved to suppress all the evidence resulting from "his arrest, the search of his home via warrants, the search of his cellphone via search warrant, and his custodial statement to the police, all as being the fruits of the poisonous tree"—the hit-and-hold. (ECF No. 22 at 1.) In addition, Mr. Walker moved to suppress evidence obtained from the search of his cell phone based on his contention that the search warrant lacked the requisite specificity. The Government opposed both motions, and I held a suppression hearing on December 18, 2024. During that hearing, Mr. Walker's Counsel stated on the record that Mr. Walker did not have "any objection to the actual search warrant of the phone" and that he was confining his suppression argument to the fruit-of-the-poisonous theory. (ECF No. 51 at 88:18-25.) Thus, I consider Mr. Walker's motion with respect to the cellphone warrant to be withdrawn. Following the suppression hearing, the Parties submitted additional briefing, and the motions are ripe for disposition.

## II.   LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure … against unreasonable searches and seizures[.]" U.S. Const. amend. IV. On a motion to suppress, the Government bears the burden of establishing that the challenged search or seizure was reasonable. *See United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). "Warrantless searches and seizures are presumptively unreasonable unless the Government satisfies its burden of establishing that one of the exceptions to the warrant requirement applies." *United States v. Bey*, 911 F.3d 139, 145 (3d Cir. 2018). The Government must satisfy its burden by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

## III.  ANALYSIS[5]

### A.   Warrantless Entry

When the Troopers executed the hit-and-hold on Mr. Walker's apartment, they did so without a warrant or other prior court approval.[6] As the Government concedes, the

---

[5] In his opening brief, Mr. Walker argued that he is entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155 (1978). However, to be entitled to a *Franks* hearing, a criminal defendant like Mr. Walker must first make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit[.]" *Franks*, 438 U.S. 154, 155-56 (1978). Mr. Walker did not identify any false statements in the various briefs he submitted in this matter, nor did he make the requisite showing at the suppression hearing.

[6] The Tracker Order is not—as a technical matter—a search warrant. Indeed, the Government acknowledges this and argues that "a court order authorizing a GPS tracker is **akin** to a search warrant …." (ECF No. 50 at 2 (emphasis added).) Mr. Walker has not challenged that assertion or otherwise argued that the Tracker Order should be

Tracker Order "did not reference the officers' authority to enter the residence to secure the package" or otherwise include express language to authorize the hit-and-hold at Mr. Walker's apartment. (ECF No. 56 at 1-2.)

The Tracker Order also does not implicitly authorize the hit-and-hold through its incorporation by reference. The Tracker Order incorporates the Tracker Application; the Tracker Application, in turn, incorporates the Tracker Affidavit; and the Tracker Affidavit requests authority to enter a secondary location in the event the tracked package moved to some other place. But that's not enough to create a judicial authorization to engage in a hit-and-hold. The Tracker Order sets out, in numbered paragraphs, the specific actions that it authorizes law enforcement officers to take. Having taken the time to spell out those specific actions, it would make no sense to think that Judge Marks also authorized a range of other actions just by a vague reference to incorporation in the preamble of the order. That's not how we read legal documents like court orders. When there's a list of things, that list controls and excludes things not listed. *See United v. Nasir*, 17 F.4th 459, 471-72 (3d Cir. 2022). The Tracker Order's reference to the Tracker Application can't overcome that because the incorporation of a document that incorporates a different

---

disregarded because it is not a warrant. Thus, I will treat the Tracker Order like a search warrant, for purposes of determining whether the hit-and-hold was lawful. To do otherwise would elevate form over substance.

document that references a hit-and-hold violates the principle that we don't assume that elephants hide in mouseholes. *See Whitman v. Am. Trucking Ass'n*, 531 457, 468 (2001).[7]

The Government suggests that the law permits a search warrant to incorporate by reference the affidavit supporting the application. There are two problems with that argument, however. *First*, that's not the law. "[A]n affidavit may be used in determining the scope of a warrant that lacks particularity if the warrant is 'accompanied by an affidavit that is incorporated by reference.'" *United States v. Tracey*, 597 F.3d 140, 146–47 (3d Cir. 2010) (quotation omitted). *Tracey* deals with a situation in which the application animates and defines the scope of an otherwise undefined warrant. That's not this case. In this case, the Tracker Order is specific in setting forth the actions that it approves. It does not need reference to the Tracker Application or the Tracker Order to clarify its scope. *Tracey* doesn't stand for the broad proposition that the use of magic words like "incorporate" means that a search warrant always draws on and approves every action that an application mentions. Instead, it just means that one can look to the application if the warrant is not specific in defining its own scope. Where, as here, the warrant or other judicial order defines its own scope, the affidavit cannot alter it.

*Second*, even if *Tracey* did contemplate incorporation in this context, it's not reasonable to read the Tracker Order to have done so. To make use of incorporation, "'the

---

[7]  These are doctrines of statutory interpretation, so they are not directly relevant to interpreting the Tracker Order. But the fundamental principles that they represent translate to the way to read the Tracker Order, too.

warrant must expressly incorporate the affidavit,' and the incorporation must be 'clear.'" *Tracey*, 597 F.3d at 147 (quote omitted). Although the Tracker Order incorporates the Tracker Application, and the Tracker Application incorporates the Tracker Affidavit, it does so for a specific purpose: to establish the probable cause necessary to obtain authorization to use a tracking device in the package. Immediately after incorporating the Tracker Affidavit by reference, the Tracker Application describes the affidavit as "setting forth specific and articulable facts establishing probable cause … and that the use of a mobile tracking device will yield information relevant to the investigation …." (ECF No. 30 at p. 27, ¶ 4.) Read in context, this suggests that the Tracker Application incorporated Trooper Montz's factual recitation from the Tracker Affidavit to support ADA Sheetz's request to use a tracking device, not for the broader authorization to engage in a hit-and-hold.

### B.     Good Faith

#### 1.     Reasonableness

Where a defendant demonstrates that an officer violated his constitutional rights, the burden shifts to the Government to show that the search or seizure was reasonable. *See United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013). "Warrantless searches and seizures are presumptively unreasonable unless the Government satisfies its burden of establishing that one of the exceptions to the warrant requirement applies." *Bey*, 911 F.3d

at 145. Pursuant to the good-faith exception, "if an officer relies in good faith on a warrant later found to be deficient, evidence obtained pursuant to that warrant should be suppressed only if the officer had—or may be fairly charged with—knowledge of the deficiency." *United States v. Fallon*, 61 F.4th 95, 108 (3d Cir. 2023) (citation omitted). But the good faith exception applies only when a warrant authorizes a particular search. The good faith exception to the warrant requirement does not apply in this case because the Tracker Order does not authorize a hit-and-hold, so the Troopers could not rely in good faith on that authorization.

The Government puts a different spin on the good faith exception in an effort to invoke it. It argues that Trooper Montz (and, by extension, the other Troopers who entered the house) made a good faith reading of the Tracker Order by reading it to authorize the hit-and-hold. There are three problems with that argument, though. *First*, the Government does not cite any cases that applies the good faith exception to police officers' reading of a court order or warrant.[8] Instead, the cases focus on what officers do when they rely on an order, not how they interpret the order in the first place.

*Second*, even if the good faith exception could apply to an officer's reading of a court order, it would not apply in this case. The "'good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have

---

[8]   I haven't found such a case, either, though I'm not going to claim that my research is exhaustive. It's not my job to do the Parties' research for them. If a party thinks the law merits a certain conclusion, it is that party's job to bring the relevant law to my attention.

known that the search was illegal' in light of 'all of the circumstances[,]'" including the officer's knowledge and experience. *Herring v. United States*, 555 U.S. 135, 145 (2009) (quotation omitted). No reasonable, well-trained officer should have read the Tracker Order to approve the hit-and-hold. Judge Marks titled the Tracker Order "Order For Authorizing The Installation And Use Of A Mobile Tracking Device." (ECF No. 30 at p. 23.) It then lists with exacting specificity the actions that it authorized, all of which are of a piece with its title. That is, it authorizes the installation and use of a mobile tracking device. No one reading this document would think that the Tracker Order also authorized entry into a protected area like Mr. Walker's residence. The Government has not carried its burden to show that a reasonable, well-trained trooper would read the preamble, with its reference to the Tracker Application, to expand the actions that the Tracker Order approves.[9] We don't hold officers to the standard of lawyers. But even reasonable people understand that when a document tells you the steps you can or should take, those are the steps you can or should take. The norm is not to assume that the documents also is telling you to go look somewhere else.

Trooper Montz's reliance on alleged consultation with ADA Sheetz and Judge Marks does not make his conduct reasonable. Certainly, a police officer is not "required to disbelieve a judge who has just advised him, by word and by action, that the warrant

---

[9]     None of this is to say that Trooper Montz didn't think, subjectively, that the Tracker Order authorized the hit-and-hold. I credit his testimony that that's what he thought. But I do think it was an unreasonable reading under the circumstances.

14

he possesses authorizes him to conduct the search he has requested." *Massachusetts v. Sheppard*, 468 U.S. 981, 989–90 (1984). But there is no evidence in the record that Judge Marks advised Trooper Montz that he was authorized to conduct a hit-and-hold of a secondary location. While the Government contends that Trooper Montz "discussed the 'hit and hold' request with the judge" (ECF No. 50 at 2), the Trooper's testimony did not go that far. At most, while testifying about his usual practice of applying for tracker orders, he made a generic reference to incorporating "that conversation with the judge while we're signing the court orders." (ECF No. 50 at 104:23-25.) It is not clear what "that conversation" refers to—a conversation with ADA Sheetz about a hit-and-hold, a separate conversation with a judge, or some other discussion. In any event, Trooper Montz never testified that he had a specific conversation with Judge Marks about the Tracker Order in this case in which she told him that it authorized a hit-and-hold.

The same is true with respect to Trooper Montz's conversation with ADA Sheetz. Consulting with prosecutors while obtaining a warrant can be evidence of good faith. *See United States v. Katzin*, 769 F.3d 163, 184 (3d Cir. 2014). Again, though, the Government's evidence falls short. While Trooper Montz testified that he discussed the hit-and-hold with ADA Sheetz, that's as much as the record reveals. The Government failed to elicit any detail about that conversation, including whether ADA Sheetz advised Trooper Montz or otherwise indicated that the Tracker Order authorized a hit-and-hold of a secondary location. Thus, the limited evidence about the conversation with ADA Sheetz is too

15

undeveloped to justify or explain Trooper Montz's "understanding that he had authority to conduct the hit and hold based on the tracker order." (ECF No. 50 at 2.)

*Third*, it's not at all clear that the Tracker Order could have preemptively authorized a hit-and-hold, even if it were explicit. The premise of a hit-and-hold is that officers will intrude on a protected area, to some extent, to ensure the status quo while they go get a warrant.[10] But implicit in all of that is that they still have to get a warrant. So, to justify a hit-and-hold, there must be some exigency that suggests that the status quo is in jeopardy, and there's no time to get a warrant. Officers can't just do it willy-nilly. A court order that said otherwise—that authorized officers to enter a protected space to maintain the status quo pending a warrant application without any immediate need—would be "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *U.S. v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001).

### 2. Culpability

Trooper Montz's lack of good faith is not the end the inquiry because application of the exclusionary rule is not automatic. *See Herring*, 555 U.S. at 137. Instead, "[i]n determining whether to suppress the fruits of an unconstitutional search, [I] must undertake a 'rigorous' cost-benefit analysis, weighing the 'deterrence benefits of

---

[10] The Third Circuit has expressed concern over "hit-and-hold procedures justified after the fact by an in-progress warrant application." *United States v. Alexander*, 54 F.4th 162, 175 (3d Cir. 2022). Trooper Montz's actions here—starting to apply for a warrant **after** conducting a hit-and-hold—is even more troubling.

exclusion' against its 'substantial social costs.'" *United States v. Caesar*, 2 F.4th 160, 169 (3d Cir. 2021) (quotation omitted). As part of that balance, courts apply the exclusionary rule when police conduct is "'deliberate, reckless, or grossly negligent,' or involve[s] 'recurring or systemic negligence.'" *Id.* at 169-70 (quotation omitted). On the other hand, "'[s]imple, isolated negligence' … does not warrant suppression." *Id.* at 170 (same). Though Trooper Montz did not act in good faith when he decided to conduct the hit-and-hold of Mr. Walker's apartment, there is nothing in the record to suggest that his conduct in this instance was anything more than isolated negligence, so I will not exclude the evidence that flowed from the warrantless entry.

There is scant case law that addresses who bears the burden of demonstrating that an act is isolated or recurring or systemic, but the Third Circuit's decision in *Tracey* suggests that the burden lies with Mr. Walker. In *Tracey*, the Circuit determined that the police conduct act issue was not deliberate or intentional and also noted that the defendant failed to "present[] evidence that [the] violation [was] an example of 'recurring or systemic negligence.'" *Tracey*, 597 F.3d at 154. Indeed, this approach makes sense for a few reasons.

*First*, it comports with the "general rule" that "the burden of proof is on the defendant who seeks to suppress evidence." *Benoit*, 730 F.3d at 288 (citation omitted). *Second*, it adheres to the presumption "that law enforcement will obey the law." *Artway*

17

*v. Att'y Gen. of State of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996).[11] Because a Fourth Amendment violation does not trigger the exclusionary rule as a matter of right, it makes sense that if the Government fails to establish that the officer acted in good faith, the burden shifts back to the defendant to show that the officer's level of culpability warrants the extreme remedy of exclusion.

In this case, the evidence does not establish that Trooper Montz's execution of the hit-and-hold was deliberate, reckless, or grossly negligent. At a minimum, "gross negligence has 'been described as the want of even scant care and the failure to exercise even that care which a careless person would use.'" *United States v. Wright*, 777 F.3d 635, 640 (3d Cir. 2015) (quotation omitted). There is no evidence in the record that Trooper Montz acted carelessly. On the contrary, the evidence reveals that Trooper Montz worked with the Lehigh County District Attorney's Office and was diligent in applying for the Tracker Order, the Apartment 2 Warrant, and then the subsequent warrant to conduct a full search of Mr. Walker's apartment (albeit, after conducting a warrantless hit-and-hold). Such conduct does not amount to gross negligence. At most, Trooper Montz's mistaken belief that the Tracker Order authorized him to conduct the hit-and-hold was "ordinary negligence"—"no more than a failure to measure up to the conduct of a reasonable

---

[11] *See also Canadian N. Ry. Co. v. Senske*, 201 F. 637, 642 (8th Cir. 1912) (describing "the universal principle which underlies all civilized government and conditions the enforcement of all rights and the administration of all remedies that all men are presumed to obey the laws, and to discharge their legal, moral, and social duties until the contrary is proved") (citation omitted).

person." *Wright*, 777 F.3d at 640.

And Mr. Walker has not come forward with any evidence demonstrating that this conduct involves recurring or systemic negligence. At most, he argues that "[t]he testimony clearly shows that … this 'hit and hold' was not one isolated act …." (ECF No. 57 at 2.) But he doesn't point me to a specific portion of testimony to support that position, and I cannot find any evidence in the record that leads me to conclude that Trooper Montz's conduct—while problematic—is part of a larger pattern. I also note the lack of cases with similar fact patterns and infer from their absence that this is not a recurring problem.[12] As such, there is little need to deter similar misconduct in the future, so the societal benefits of refusing to suppress the evidence in this case outweighs any minimal deterrent effect that suppression may have.[13]

**IV.   CONCLUSION**

I am troubled by the Troopers' conduct in this case. Because it seems to be a unique set of circumstances, I won't exclude the evidence. But, if this situation recurs, then it is my hope and expectation that this decision will provide some guidance to law enforcement officers as to how to read judicial orders and whether and when they can

---

[12] Based on my research, it appears that officers conduct hit-and-holds in the face of exigent circumstances.
[13] Because I have determined that suppression is not warranted, I need not consider the Government's alternative argument that the inevitable discovery doctrine applies.

execute a hit-and-hold before seeking a warrant. An appropriate Order denying the Motion follows.

**BY THE COURT:**

/s/ Joshua D. Wolson
JOSHUA D. WOLSON

January 21, 2025